UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

GLEN E. VAN DYKE,                    )
                                     )
                    Plaintiff,       )
                                     )
            v.                       )        No.  2:13CV22 TIA
                                     )
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,     )
                                     )
                    Defendant.       )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the Commissioner's final decision denying Glen E. Van Dyke's

application for disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401, *et seq.*, and application for supplemental security income

under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  All matters are pending

before the undersigned United States Magistrate Judge, with consent of the parties,

pursuant to 28 U.S.C. § 636(c).  Because the Commissioner's final decision is

supported by substantial evidence on the record as a whole, it is affirmed.

### I.  Procedural History

On May 11, 2010, the Social Security Administration denied plaintiff Glen

E. Van Dyke's February 1, 2010, applications for disability insurance benefits

(DIB) and supplemental security income (SSI), in which he claimed he became disabled on July 30, 2009, because of depression, anxiety, bipolar disorder, hyperglycemia, and chronic arthritis. (Tr. 104, 105, 106-07, 216-22, 223-28, 257.) Upon plaintiff's request, a hearing was held before an administrative law judge (ALJ) on November 2, 2011, at which plaintiff and a vocational expert testified. (Tr. 28-103.) On December 14, 2011, the ALJ issued a decision denying plaintiff's claims for benefits, finding plaintiff able to perform work as it exists in significant numbers in the national economy, and specifically, production assembler, hand packager, and machine packager. (Tr. 8-22.) On January 31, 2013, upon review of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff raises numerous claims arguing that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff claims that the ALJ improperly weighed the opinion evidence in this cause, which included a failure to consider the opinion of psychiatrist, Dr. Harden. Plaintiff also claims that the ALJ failed to consider evidence of his asthma condition. Plaintiff also claims that the ALJ erred by failing to find that the marked limitations caused by his mental impairment met or equaled a listed impairment. Plaintiff further contends that the ALJ erred in

determining his complaints not to be credible.  Finally, plaintiff argues that the ALJ erred in relying on vocational expert testimony that was based on a faulty hypothetical question.  Plaintiff requests that the final decision be reversed and that the matter be remanded for further consideration.  For the reasons that follow, the ALJ did not err in her determination.

## II.  Testimonial Evidence Before the ALJ

A.      <u>Plaintiff's Testimony</u>

At the hearing on November 3, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-two years of age.  Plaintiff is separated from his spouse and has two children, ages fourteen and twenty-six.  Plaintiff lives in an apartment with his fourteen-year-old daughter.  Plaintiff stands five-feet, eleven inches tall and weighs 190 pounds.  Plaintiff has a seventh grade education and never obtained his GED.  (Tr. 44-47.)

Plaintiff's Work History Report shows that plaintiff worked as a cook and dishwasher at a restaurant from 1986 to 1988.  From 1988 to 1999, plaintiff worked as a dishwasher, cook, and meat cutter at a university cafeteria.  In October and November 2001, plaintiff worked as a truck driver.  From November 2002 to July 2009, plaintiff worked as a driver and did paperwork for OATS, Inc.  (Tr.

288.)  Plaintiff testified that he was terminated from this last job when he became sick and experienced sleep issues on account of anxiety.  (Tr. 44, 74.)

Plaintiff testified that he was involved in two car accidents that caused injury to his neck.  Plaintiff testified that an MRI taken of his neck in January 2010 in relation to one accident showed bulging discs.  Plaintiff testified that he experiences pain, popping, cracking, and headaches because of his injury and that he is limited in his ability to move his neck.  Plaintiff testified that the pain radiates and causes numbness in his arms and that his doctors have opined that the condition is because of a pinched nerve.  Plaintiff testified that he drops things but that braces he wears for the condition help the numbness.  Plaintiff testified that injection therapy worsened the pain.  Plaintiff testified that surgery was considered but that his doctors recommended against it because of his age.  (Tr. 50-53, 79-81.)

Plaintiff testified that he has experienced migraine headaches since he was ten or eleven years of age and that he currently has them two or three times a week, each lasting up to an hour and a half.  Plaintiff testified that he takes Extra Strength Tylenol for the headaches and lies down with a cool cloth on his head.  Plaintiff testified that his headaches are related to his neck condition.  (Tr. 49-50.)

Plaintiff testified that he experiences pain in his lower back and hips and that such pain has worsened during the last ten years.  Plaintiff testified that the hip

pain radiates to his legs and that he sometimes has difficulty getting out of bed. (Tr. 55-56.)

Plaintiff testified that he also has a torn rotator cuff and pulled tendons in his left shoulder that limit his ability to lift things and reach above his head. (Tr. 53.)

Plaintiff testified that he also has asthma for which he uses an inhaler daily. Plaintiff testified that the condition causes him to become winded when he walks a short distance or does "anything." Plaintiff testified that he becomes short of breath after walking one block. (Tr. 54-55.)

Plaintiff testified that he has abdominal pain that the doctors attribute to irritable bowel syndrome, although he has experienced no other symptoms. (Tr. 55.)

Plaintiff testified that he has been seeing a mental health professional for over one year and is being treated for depression and bipolar disorder. Plaintiff testified that he has difficulty leaving his apartment and being around people, and that he spends at least five hours a day in his bedroom. Plaintiff testified that nearly every day is a bad day during which he cries a lot and feels like a failure. Plaintiff testified that his day improves when his daughter comes home from school and he is able to spend time with her. Plaintiff testified that medication for his bipolar disorder somewhat helps. Plaintiff testified that he also experiences panic attacks during which his heart races and he feels nauseated. Plaintiff

testified that the episodes last about fifteen to twenty minutes. Plaintiff testified that he experiences such episodes in crowds and therefore avoids being around too many people. Plaintiff testified that he also has racing thoughts and that he has difficulty sleeping because of them. (Tr. 56-59, 62-64, 67.)

Plaintiff testified that he was previously diagnosed with attention deficit disorder (ADD) and has difficulty concentrating and following through on tasks. Plaintiff testified that he takes Adderall for the condition and that the medication helps motivate him to do things. (Tr. 60-61.)

Plaintiff testified that his medications cause side effects, including dizziness, lightheadedness, and nausea, and that he goes back to bed when experiencing such side effects. Plaintiff testified that his doctors have adjusted his medications on numerous occasions because of the side effects. (Tr. 62, 67.)

Plaintiff testified that he used have an alcohol problem but has been clean and sober since October 2010. Plaintiff testified to having some drinks in May 2011 but that he no longer abused alcohol. (Tr. 63, 76-77.)

As to his exertional abilities, plaintiff testified that he gets sore, stiff, and nervous while sitting and must stand or lie down after thirty to forty-five minutes. Plaintiff testified that he gets sore and stiff after standing for thirty to forty-five minutes and then needs to sit or lie down. Plaintiff testified that he changes positions throughout the day. Plaintiff testified that he can walk no more than two

blocks.  Plaintiff testified that he can comfortably lift twenty pounds.  (Tr. 64, 69-70, 73.)

As to his daily activities, plaintiff testified that he gets up between 10:00 and 11:00 a.m. and prepares himself breakfast.  Plaintiff testified that he watches television for about thirty minutes, lies back down by 1:00 p.m., and gets up around 3:30 p.m. when his daughter comes home from school.  Plaintiff testified that since he last worked, he is up no more than two to three hours between 8:00 a.m. and 5:00 p.m.  Plaintiff testified that he does laundry once a week, does the dishes, and prepares dinner for his daughter every night.  Plaintiff testified that he generally does not leave his home to see anyone and that no one comes over to visit him.  Plaintiff testified that he likes to go for car rides with his daughter.  (Tr. 64-66, 81-82.)

B.      Testimony of Vocational Expert

Gail Leonhardt, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Mr. Leonhardt classified plaintiff's past work as an auto detailer, industrial cleaner, and dishwasher as medium and unskilled; as a van driver as medium and semi-skilled; as a meat cutter as heavy and skilled; and as a cook as medium and skilled.  (Tr. 84-85.)

The ALJ asked Mr. Leonhardt to assume an individual of plaintiff's age, education, and past relevant work. The ALJ then asked Mr. Leonhardt to assume this individual was limited to unskilled, light work, meaning

> lifting and carrying 20 pounds occasionally and frequently; and standing and walking limited to two hours; sitting less than six hours in an eight-hour workday but periodically alternating sitting and standing every, like, 45 minutes; and no more than occasional pushing and pulling in both the upper and lower extremities; no more than occasional climbing, balancing, kneeling, crouching, crawling, or stooping; and no more than occasional reaching in all directions - - including overhead - - handling, and fingering; and no exposure to temperature extremes, no exposure to vibration, no exposure to humidity or wetness, or hazards such as machinery or heights.

(Tr. 86.)

Mr. Leonhardt testified that the walking, standing, and sitting restrictions would limit such a person to sedentary work, and thus that the person could not perform any of plaintiff's past work. Mr. Leonhardt testified, however, that light work at an unskilled level was available as an information clerk, of which 1,800 such jobs with a sit/stand option existed in the four-state region, 750 in the State of Missouri, and 41,000 nationally. (Tr. 87-88.) Mr. Leonhardt testified that no jobs were available at the sedentary level with the same restrictions. (Tr. 89-90.)

The ALJ then asked Mr. Leonhardt to assume an individual limited to light work with the same restrictions, except that the reaching limitation applied only to the left upper extremity. Mr. Leonhardt testified that such a person could work as a cashier, of which 17,000 such jobs with a sit/stand option existed in the region,

4,000 in the State of Missouri, and 1,103,014 nationally; and as a housekeeper/ cleaner, of which 8,300 such jobs with a sit/stand option existed in the region, 2,500 in the State of Missouri, and 180,000 nationally. (Tr. 90-91.)

The ALJ then asked Mr. Leonhardt to consider this same individual but with additional limitations of "only occasional interaction with the public, supervisors, and coworkers; and work in a low-stress job defined as having only occasional simple work-related decision making required and few if any changes in the work setting." (Tr. 92.) Mr. Leonhardt testified that such a person could continue to perform work as a housekeeper/cleaner. (*Id.*)

Finally, the ALJ asked Mr. Leonhardt to assume an individual with no exertional limitations who could perform work at all exertional levels but that the individual was "limited to routine and repetitive tasks consistent with unskilled work, involving only simple work-related decisions with few if any workplace changes, and no interaction with the public, and only occasional interaction with supervisors and coworkers but . . . no tandem tasks." (Tr. 93.) Mr. Leonhardt testified that such a person could not perform any of plaintiff's past relevant work or work as a cashier, but otherwise could perform all other work to which he previously testified, including production assembler, of which 1,928 such jobs existed at the light level in the region and 40,998 nationally; hand packager, of which 14,148 such jobs existed at the light level in the region and 311,534

nationally; machine packager, of which 10,183 such jobs existed at the light level in the region and 162,026 nationally; and office helper, of which 4,645 such sedentary jobs existed in the region and 96,041 nationally.  (Tr. 93-95.)

Mr. Leonhardt testified that there are no provisions for individuals who require unscheduled breaks beyond the midmorning, lunch, and midafternoon breaks.  Mr. Leonhardt also testified that being absent on more than two occasions each month is unacceptable.  Mr. Leonhardt testified that the jobs previously described require a person to maintain focus all of the time.  (Tr. 98-99.)

### III.  Education Records Before the ALJ

In October 1982, while in the sixth grade, plaintiff underwent the Wechsler Intelligence Scale for Children-Revised and obtained a verbal IQ score of 84, a performance IQ score of 88, and a full scale IQ score of 85.  (Tr. 302.)  Further testing showed plaintiff to perform at the sixth grade level in reading, at the fifth grade level in mathematics and basic skills, and at the fourth grade level in language.  (Tr. 294.)

In the seventh grade, plaintiff was noted to be learning disabled in math. While in the seventh and eighth grades, plaintiff was noted to be learning disabled in social studies.  During second semester eighth grade, plaintiff earned F grades in physical education, English, earth science, and math.  Plaintiff earned D's in music, art, and shop.  Plaintiff earned a C in social studies.  (Tr. 293.)  At the end

of the school year, it was determined that plaintiff would be retained in eighth grade.  (Tr. 300.)

## IV.  Medical Records Before the ALJ

Plaintiff visited Northeast Missouri Health Council (NMHC) on March 2, 2009, for checkup and medication refills.  Plaintiff's history of allergic rhinitis and depression was noted.  Depression screening was negative.  Plaintiff's prescriptions for Celexa and Claritin were refilled.  (Tr. 330.)

On June 15, 2009, plaintiff's spouse called NMHC and reported that plaintiff was extremely depressed and had started drinking again.  Mrs. Van Dyke reported that Celexa worked well for plaintiff until the previous month, and that other medications caused bad side effects or adverse reactions.  (Tr. 329.)

In a questionnaire completed July 1, 2009, plaintiff reported to NMHC that he felt depressed, down, or hopeless on a daily basis; had little interest or pleasure; had sleeping problems; felt tired or had little energy; felt bad about himself; had trouble concentrating on things; and experienced slow movement or speech or, alternatively, experienced restlessness or fidgetiness.  Plaintiff reported having an unbalanced appetite and that he sometimes thought of hurting himself or thinking himself better off dead.  (Tr. 328.)  Depression screening was positive, and plaintiff requested an increase in medication.  It was noted that plaintiff had increased his drinking and that he drank heavily one time a week.  Plaintiff exhibited no manic

symptoms, but increased anxiety was noted. Examination showed plaintiff to appear well and be in no acute distress. Plaintiff was noted to be alert and oriented and to display a normal affect. Dr. Novinger and Maxine Gerdes, CMS IV, diagnosed plaintiff with depression and alcohol abuse. Plaintiff was prescribed Paxil and was instructed to return in one month. (Tr. 327.)

On November 3, 2009, plaintiff visited family nurse practitioner Beth Schrage at NMHC with complaints relating to upper respiratory infection. Medication was prescribed. (Tr. 341.)

On December 22, 2009, plaintiff returned to FNP Schrage with complaints of low blood sugar that caused him to fall asleep while driving, feel sick to his stomach, and experience dizziness with lightheadedness. Plaintiff also reported that he has never been able to stay asleep and that he has had anger and depression issues for years. It was recommended that plaintiff be evaluated by a licensed clinical social worker for such issues. (Tr. 340.)

Plaintiff was admitted to the emergency room at Northeast Regional Medical Center on January 3, 2010, after being involved in a motor vehicle accident. Physical examination was normal in all respects, and plaintiff was noted to be neurologically intact. CT scans of the head and cervical spine were normal. Plaintiff was diagnosed with cervical spasm and was prescribed ibuprofen, Percocet, and Flexeril. (Tr. 333-38.)

Plaintiff visited FNP Schrage at NMHC on January 5, 2010, and complained of insomnia. Plaintiff also reported that he gets weak, sweaty, and cannot stand when his blood sugar level drops. Elavil was prescribed for insomnia. (Tr. 339.)

On March 31, 2010, plaintiff visited Donna Peissner, MA, LCSW, at NMHC upon referral by FNP Schrage for assessment and counseling. Plaintiff reported being anxious and depressed with a history of alcohol usage and learning disabilities. Plaintiff reported having a difficult time remaining employed because of extreme depression, attention difficulties, and not being able to stay on task. Plaintiff reported drinking periodically. Mental status examination showed plaintiff to be cooperative but to have a difficult time sitting still. Plaintiff's affect was noted to be down and depressed. Plaintiff reported having difficulty functioning day-to-day. Plaintiff appeared motivated to seek help. Plaintiff reported having suicidal feelings but that he had no plan or intentions. Ms. Peissner diagnosed plaintiff with attention deficit hyperactivity disorder (ADHD) /rule out bipolar disorder, and alcohol dependence. Ms. Peissner determined plaintiff's current Global Assessment of Functioning (GAF) score to be 41-50, opining that plaintiff had a prior GAF score of 51-60.[1] (Tr. 352-54.)

---

[1] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." *Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34* (4th ed. 2000). A GAF score of 41-50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). A GAF score of 51 to 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional

On April 2, 2010, plaintiff underwent a consultative psychiatric evaluation in relation to his Medicaid application. Plaintiff reported being disabled because of depression and arthritis. Plaintiff reported seeing a psychiatrist when he was fourteen years of age and that he was currently being treated with Celexa. Plaintiff reported that he was currently able to drive, cook, do laundry and housekeeping chores, and go shopping at the store. Plaintiff reported not being involved in any social activities or groups and that he had not had any alcohol in the past week. Plaintiff reported having difficulty getting along with bosses in his previous jobs. Plaintiff reported having lost consciousness on twenty or more occasions because of hypoglycemia and on at least 200 occasions because of alcohol. Mental status examination showed plaintiff to have interactive eye contact, cooperative attitude, and logical thought processes. Plaintiff's mood was "blah" and his affect was bland. Plaintiff reported his sleep, appetite, energy, motivation, concentration, and enjoyment of life to be markedly diminished. Plaintiff reported having trauma-related nightmares, trauma-related flashback memories, and panic attacks on a weekly basis. Plaintiff identified with criteria positive for ADHD and bipolar disorder. Cognitive functioning, concentration, and recall abilities were intact. Plaintiff's insight and judgment were noted to be appropriate. Dr. Jeffrey Harden diagnosed plaintiff with bipolar II disorder, most recent episode depressed; adult

---

panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few

ADHD, combined type; poly substance abuse (marijuana and alcohol), in remission; and learning disorder. Dr. Harden determined plaintiff's current GAF score to be 50, with plaintiff's highest GAF score within the previous year to be 60. Dr. Harden recommended that plaintiff pursue definitive treatment for bipolar depression and ADHD. (Tr. 344-46.)

Plaintiff returned to Ms. Peissner on April 7, 2010, and reported severe depressive symptoms. Plaintiff reported that he was avoiding others and isolating himself, had difficulty with anger and frustration, and had overwhelming stress with feelings of panic. Ms. Peissner diagnosed plaintiff with ADHD and bipolar disorder. Ms. Peissner noted plaintiff to be very motivated to make changes. Plaintiff reported that he would make another appointment with Dr. Harden in order to obtain medication once he had the money to do so. (Tr. 351.)

On April 26, 2010, plaintiff underwent a consultative psychiatric evaluation for disability determinations. Plaintiff was alert and cooperative but was noted to be irritable. Plaintiff exhibited difficulty with cognitive processing and moderate deficits in memory function. Dr. James L. Tichenor noted plaintiff's attention and concentration to be low average. Plaintiff's thought processes were logical and coherent. Plaintiff's mood was noted to be irritable and depressed, but his affect was under control. Plaintiff reported a history of alcohol abuse but that he had

---

friends, conflicts with peers or co-workers).

abstained from alcohol for a seven-year period when he worked for OATS.

Plaintiff reported that he begin drinking again and lost his job.  Plaintiff reported

that he currently drinks and passes out about three times a week.  Plaintiff reported

his sleep to be disrupted because of racing thoughts.  Plaintiff reported not taking

any psychotropic medication.  Plaintiff's scores on the Beck Depression Inventory

II placed him in the severe range.  Bipolar screening showed a significant number

and intensity of bipolar symptoms.  Dr. Tichenor diagnosed plaintiff with bipolar

disorder (provisional) and alcohol abuse, and assigned a current GAF score of 55.

(Tr. 347-49.)  Dr. Tichenor concluded:

> Mr. Vandyke presented as an angry and depressed individual who is
> abusing alcohol.  He has a long history of impulsive acting-out
> behaviors to include racing thoughts, assault, and suicide attempts.
> His ability to understand and remember instructions, to attend to and
> to complete tasks, and to interact socially and adapt are all lowered at
> this time and would make competitive employment difficult.
> However, if he drank less and took appropriate medication, he may be
> able to function in a work activity satisfactorily.

(Tr. 349.)

Plaintiff returned to Ms. Peissner on April 28, 2010, and reported having had

a bad two weeks.  Plaintiff reported having gotten drunk six times and sleeping

only two or three hours at night.  Plaintiff reported being anxious, upset, and

unable to sit in the house.  Plaintiff reported being extremely depressed, feeling

down, and feeling bad about himself.  Plaintiff reported being impulsive and that

his anger outbursts were severe.  Ms. Peissner noted plaintiff to score extremely

high on the depression scale and to exhibit a lot of depressive symptoms and ADHD symptomology. Plaintiff was instructed to see Dr. Harden to start medication management. (Tr. 350.)

On May 7, 2010, Stanley Hutson, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which he opined that plaintiff's adult ADHD, learning disability, bipolar II disorder/rule out anti-social personality disorder (ASPD), and substance addiction disorder caused mild restrictions in activities of daily living; moderate restrictions in maintaining social functioning and in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. (Tr. 358-69.) In a Mental Residual Functional Capacity (RFC) Assessment completed that same date, Dr. Hutson opined that, in the domain of Understanding and Memory, plaintiff was moderately limited in his ability to understand and remember detailed instructions, but was not otherwise significantly limited. In the domain of Sustained Concentration and Persistence, Dr. Hutson opined that plaintiff was moderately limited in his abilities to carry out detailed instructions and to maintain attention and concentration for extended periods, but was not otherwise significantly limited. In the domain of Social Interaction, Dr. Hutson opined that plaintiff was moderately limited in his abilities to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or

peers without distracting them or exhibiting behavioral extremes, but was not otherwise significantly limited.  In the domain of Adaption, Dr, Hutson opined that plaintiff was moderately limited in his abilities to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, and to set realistic goals or make plans independently of others.  Dr. Hutson opined that plaintiff was not significantly limited in his ability to travel in unfamiliar places or use public transportation.  Dr. Hutson concluded that plaintiff had worked and demonstrated the ability to understand, remember, and follow instructions; could complete routine tasks; and could cope in a low stress work setting.  (Tr. 355-57.)

On June 9, 2010, plaintiff visited FNP Schrage and complained of moderate to severe bilateral numbness in his feet that caused him to feel unsteady, especially when going up and down stairs and climbing ladders.  Plaintiff also reported having numbness in the hands that he experienced mostly at night.  Plaintiff also complained of severe arthritis pain the neck, low back, bilateral shoulders, bilateral hands, bilateral knees, and bilateral feet.  Plaintiff reported that activity and cold or rainy weather aggravated the pain and that nothing relieved it.  FNP Schrage noted plaintiff's depression, insomnia, gastroesophageal reflux disease (GERD), and hypertension to be chronic problems.  Depression screening yielded positive results for severe depression.  Physical examination was unremarkable, with normal

musculature, no joint deformity or abnormalities, and normal range of motion. Plaintiff was prescribed Guanfacine, Vitamin B-12, AcipHex, and Celebrex and was instructed to stop Celexa, Mobic, Prilosec, and Amitriptyline.[2]  Dr. Janet K. Corbett approved of this plan.  Plaintiff was instructed to return in one week.  (Tr. 370-72.)

Plaintiff also visited Ms. Peissner on June 9, 2010, and reported that things were not better and that the medication prescribed by Dr. Harden did not help. Plaintiff reported that the medication worsened his symptoms and made him hyper. Plaintiff reported feeling down, having trouble sleeping, being stressed, and having disturbing and intrusive thoughts.  Plaintiff reported that he planned to stop drinking.  Ms. Peissner noted plaintiff to have a positive mood and affect, and plaintiff reported having recently spent time with his daughter, which always helped him.  Ms. Peissner noted plaintiff to continue to have increased depression and ADHD symptoms and encouraged plaintiff to take his medication appropriately.  It was noted that plaintiff was having difficulty with the side effects of his medications.  Plaintiff was encouraged to contact Dr. Harden to change medications.  (Tr. 497-98.)

_____

[2] The administrative record does not contain any record as to when these medications were first

Plaintiff returned to FNP Schrage on June 16, 2010. Depression screening yielded positive results for moderate depression. Plaintiff was instructed to return in one week. (Tr. 373-74.)

Plaintiff visited Dr. William O. Hopkins at Columbia Regional Hospital-Orthopaedic Clinic on June 25, 2010, for evaluation of neck pain, headaches, arm pain, tingling, and numbness. Plaintiff reported that he rarely drank alcohol and had no history of alcohol abuse. Examination of the cervical spine showed rotation and extension to cause neck pain and upper extremity tingling, predominantly on the right. Sensation to light touch was somewhat diminished in the right hand. A little bit of weakness with some abduction on the right was noted, but muscle strength was otherwise good. Positive Tinel sign and positive Phalen test suggested the possibility of carpal tunnel syndrome on the right. X-rays of the cervical spine showed the cervical curve to be somewhat straight. Mild degenerative changes at the C5-6 were noted with some posterior osteophytic proliferation and minimal foraminal narrowing. Loss of normal cervical lordosis was noted to be possibly the result of muscle spasm. Dr. Hopkins opined that plaintiff may have cervical radiculopathy with possible right carpal tunnel overlay. An MRI was ordered and epidural steroid injections were considered. (Tr. 561-63, 568.)

prescribed or by whom.

An MRI taken of the neck on July 2, 2010, showed mild right posterior lateral disc protrusion at C5-6 resulting in minimal pressure on the anterior thecal sac – more marked on the right side, and mild encroachment of the right neural foramen. No spinal stenosis was noted. Disc bulge at C6-7 was also noted but without significant pressure on the thecal sac or neural foramina encroachment. (Tr. 569-70.) Upon review of the MRI results, Dr. Hopkins noted plaintiff's physical findings and complaints to be indicative C5-6 radiculopathy. An epidural steroid injection was suggested. (Tr. 571-72.)

Plaintiff visited Ms. Peissner on July 7, 2010, and reported that his life was falling apart. Plaintiff reported having physical issues with his spine and neck and that injection therapy was planned. Plaintiff reported feeling very depressed and that he was unable to concentrate. It was noted that plaintiff had been without his Adderall for one month because of lack of funds. Plaintiff reported drinking a twelve-pack of beer over the holiday weekend. Plaintiff was diagnosed with ADHD, alcohol dependence, and bipolar disorder. Ms. Peissner determined to seek assistance in obtaining medication therapy through a primary care physician since plaintiff could not afford to see Dr. Harden. (Tr. 500-01.)

Plaintiff visited Dr. Justin Puckett at Complete Family Medicine on August 7, 2010, for review of his conditions. With respect to bipolar disorder, Dr. Puckett noted plaintiff to have previously been treated by Dr. Harden and Dr. Corbett and

had been prescribed Guanfacine and Abilify. Plaintiff reported that he received no benefit from either medication and stopped taking them. Plaintiff also reported taking Adderall in the past and that the medication made him feel like he was on a roller coaster of emotions. With respect to his anxiety, plaintiff reported feeling constantly frustrated, depressed, angry, unmotivated, and having no energy or ability to focus. Dr. Puckett also noted plaintiff's history of ADD. With respect to his degenerative joint disease of the back, plaintiff reported receiving injection therapy. Plaintiff reported his hyperglycemia to be controlled with diet. Physical examination yielded normal results, with normal musculature, no joint deformity or abnormalities, and normal range of motion. No motor or sensory deficits were noted. Plaintiff's gait was noted to be normal. Dr. Puckett prescribed Vyvanse for bipolar disorder and instructed plaintiff to continue with Abilify. Celebrex was also prescribed. Laboratory testing was ordered. (Tr. 472-76.)

Plaintiff was administered an epidural steroid injection at the C7-T1 level on August 10, 2010. Plaintiff reported no change in his pain level. (Tr. 573-74.)

Plaintiff returned to Dr. Puckett on August 21, 2010. Dr. Puckett noted plaintiff's chronic problems to be bipolar disorder, generalized anxiety disorder, and ADD. Plaintiff reported that he continued to fidget and isolate himself but that Vyvanse helped motivate him to get up and work on his truck instead of sitting inside. Plaintiff reported having insomnia and being excessively tired during the

day.  It was noted that plaintiff took Abilify for sleep.  Plaintiff reported having a lot of anger and little patience with young people.  Plaintiff reported having good relationships with his children but not with his spouse.  Plaintiff reported drinking more than five glasses of beer a day.  Physical examination was normal.  Dr. Puckett noted plaintiff to exhibit no unusual anxiety or evidence of depression.  Plaintiff was instructed to increase his dosage of Abilify for improved sleep and to continue with Vyvanse.  Plaintiff was also encouraged to continue his counseling sessions with Ms. Peissner.  (Tr. 465-68.)

Plaintiff returned to Dr. Puckett on September 7, 2010, and reported continued problems with sleep, even with the increased dosage of Abilify.  Plaintiff also reported that Vyvanse gave him more energy but made him testy.  Dr. Puckett noted plaintiff's chronic problems to include joint pain, bipolar disorder, generalized anxiety disorder, and ADD.  Dr. Puckett instructed plaintiff to continue to increase his medication for anxiety until better control was achieved.  Plaintiff was also instructed to continue with his medications for bipolar disorder and ADD.  Dr. Puckett noted plaintiff's joint pain to be stable.  (Tr. 461-64.)

Plaintiff visited Dr. Hopkins on September 9, 2010, and reported increased pain since his epidural injection.  No improvement in plaintiff's symptoms was noted.  Plaintiff also complained of low back pain.  Dr. Hopkins determined to refer plaintiff for surgical evaluation.  (Tr. 575-76.)

Plaintiff visited FNP Schrage on September 23, 2010, and reported his depression not to be as severe and that he continued to see a therapist. Depression screening yielded positive results for severe depression. (Tr. 393.) It was noted that plaintiff's current medications included Adderall, Trazodone, Mobic, and Abilify. (Tr. 394.)

On September 23, 2010, FNP Schrage completed a Physical Medical Source Statement (MSS) of Ability to do Work-Related Activities in which she opined that plaintiff could occasionally lift ten pounds and frequently lift less than ten pounds; could stand and/or walk at least two hours in an eight-hour workday; could sit less than about six hours in an eight-hour workday, alternating between sitting and standing every thirty minutes; and was limited in pushing and pulling with his upper extremities in that such activity causes severe pain and numbness after several minutes. FNP Schrage opined that plaintiff could occasionally climb, balance, kneel, crouch, crawl, and stoop, and noted that plaintiff reported he would be unable to perform work requiring such positions because of pain. FNP Schrage further opined that plaintiff was limited in his ability to reach in all directions, handle, and finger but could occasionally engage in such activities. FNP Schrage reported that such limitations were because of daily numbness experienced by plaintiff as well as his history of torn left rotator cuff and left arm numbness if he

raises the arm over his head. FNP Schrage opined that plaintiff had no visual or communicative limitations. (Tr. 379-82.)

Plaintiff visited Dr. Puckett on September 24, 2010, for follow up of ADHD, GERD, sleep problems, and anxiety. Plaintiff reported feeling less on edge while taking Adderall and that Vyvanse helped him feel more motivated. Plaintiff reported continued problems with sleep. Plaintiff also reported feeling anxious and nervous and that he could not sit still. Physical and psychiatric examinations were normal. Plaintiff was instructed to increase his dosage of Adderall. Trazodone was prescribed for sleep, and Buspar was prescribed for anxiety. (Tr. 457-60.)

Plaintiff called Dr. Puckett's office on October 1, 2010, complaining of tingling and numbness in his feet, hot flashes, and weakness. Plaintiff reported that he thought he was going to pass out. It was noted that plaintiff had an upcoming appointment. (Tr. 455.) Plaintiff visited Dr. Puckett on October 7 and reported improvement with the adjusted dosage of Adderall. Plaintiff reported continued sleep problems. Physical and psychiatric examinations were normal. Celebrex was prescribed for joint pain inasmuch as Naproxen failed to provide relief. Plaintiff's prescriptions for Trazodone and Abilify were refilled. (Tr. 451-54.)

Plaintiff visited Dr. Craig Kuhns at the Orthopaedic Clinic on October 14, 2010, regarding his neck pain. Plaintiff rated his pain at a level six or seven out of

ten.  Plaintiff reported the pain to worsen with any activity.  Plaintiff also reported

some occasional numbness in both hands when he grips things for an extensive

period of time, but reported it not to radiate from his neck.  Physical examination

showed no obvious neurovascular deficits in either upper extremity.  Sensation was

noted to be intact to light touch.  Plaintiff's strength was noted to be 5/5 in

shoulder abduction, biceps flexion, triceps extension, wrist extension and flexion,

finger abduction/adduction and grip.  Plaintiff was noted to have 2+ and symmetric

reflexes at the biceps, triceps, and brachioradialis bilaterally as well as 2+ palpable

radial pulses and brisk capillary refill in all fingers.  Examination of the neck

showed tenderness to palpation in the midline along C5-6.  Spurling's test was

positive to the left and right with pain elicited within the midline of the neck.  No

obvious tenderness was noted along the spine.  Dr. Kuhns diagnosed plaintiff with

mild degenerative disc disease and protrusion at C5-6.  Dr. Kuhns recommended

conservative treatment such as physical therapy, exercises, medication, and

improvement in overall health.  (Tr. 579-82.)

EMG/nerve conduction studies performed on October 14, 2010, showed

mild sensory neuropathy but no evidence of carpal tunnel syndrome,

radiculopathy, plexopathy, or ulnar entrapment.  (Tr. 577-78.)

On October 18, 2010, Dr. Harden completed a Mental MSS in which he

opined that plaintiff had moderate restrictions in his ability to make judgments on

complex work-related decisions and mild restrictions in his abilities to make

judgments on simple work-related decisions and carry out complex instructions.

Dr. Harden further opined that plaintiff had no restrictions in his abilities to

understand, remember, and carry out simple instructions and to understand and

remember complex instructions.  Dr. Harden further opined that plaintiff was

markedly limited in his abilities to interact appropriately with supervisors and to

respond appropriately to usual work situations and to changes in a routine work

setting; and moderately limited in his ability to interact appropriately with the

public and with coworkers, specifically noting that plaintiff socially isolated

himself.  (Tr. 384-85.)  Dr. Harden reported that plaintiff

> has a lengthy history of serious difficulties with paying attention,
> mood swings consisting of impulsivity and irritability of multiple days
> duration once a month or more frequently, anxiety manifest[ed] by
> one or more hours spent in unnecessary rechecking of items/situations
> in his environment most days and avoidance of public places/leaving
> home unless absolutely necessary.  He also has a history of apparently
> excessive preoccupation with issues of "fairness" in the workplace
> manifest[ed] by a pattern of difficulties getting along with bosses and
> being fired from approx[imately] 40% of his jobs.

(Tr. 384.)

Dr. Harden agreed that plaintiff's disability began July 30, 2009.  (Tr. 385.)

Plaintiff visited Dr. Puckett on October 22, 2010, with continued complaints

of insomnia.  Plaintiff reported that his medication made him dizzy and made his

legs feel heavy but did not help him sleep.  Plaintiff also reported having pain in

his legs while walking and that he experienced muscle weakness and myalgia. Dr. Puckett noted plaintiff's ADD to be stable on the current medication. Physical and psychiatric examinations were normal. Plaintiff was prescribed Klonopin for sleep. (Tr. 447-50.)

Plaintiff visited Dr. Puckett on November 17, 2010, and reported that he did not feel well while taking Klonopin, Trazodone, and Abilify at the same time. Plaintiff reported that the medications made him feel drugged and "not quite [with] it." Physical and psychiatric examinations were normal. Plaintiff was instructed to discontinue Trazodone and to increase his dosage of Klonopin. (Tr. 439-42.)

On December 15, 2010, plaintiff reported to Dr. Puckett that his ADHD medication was working well. Plaintiff reported Klonopin not to help with his insomnia and that he has had sleep problems his entire life. Plaintiff reported his anxiety to be better since he changed residences and was living alone in that things were quieter and less stressful. Plaintiff's history of alcohol use was noted to consist of consuming more than five glasses of beer monthly. Physical and psychiatric examinations were normal. Plaintiff was instructed to continue with his medications and to add Trazodone to his medication regimen to help with sleep. (Tr. 433-36.)

Plaintiff visited Ms. Peissner on January 12, 2011, and reported having continued difficulty with sleep. Plaintiff reported being elated that his daughter

was coming to live with him. Plaintiff reported being "clean." Depression screening showed mild depression. Mental status examination showed plaintiff to have hyperactive psychomotor behaviors and distracted attention. Plaintiff's affect was appropriate and his mood was depressed. Plaintiff's memory was noted to be intact. Plaintiff had a cooperative attitude and demonstrated fair reasoning, impulse control, judgment, and insight. Plaintiff's thought processes were logical. Plaintiff did not express any suicidal or homicidal ideation. Plaintiff was diagnosed with ADHD, predominantly hyperactive-impulsive; bipolar disorder; and alcohol abuse. Ms. Peissner determined plaintiff's current GAF score to be 50. Plaintiff was instructed to return in two weeks. (Tr. 503-05.)

On January 14, 2011, plaintiff reported to Dr. Puckett that he had difficulty getting out of bed in the morning because of Klonopin, Trazodone, and Abilify. Physical examination showed tenderness to palpation of the cervical neck, decreased range of motion about the upper extremities bilaterally, and crepitus with cervical spine motion. Psychiatric examination was normal. Plaintiff was diagnosed with insomnia, bipolar disorder, ADD, generalized anxiety disorder, and arthropathy involving multiple sites. Plaintiff was prescribed Valium for insomnia and was instructed to discontinue Klonopin. Plaintiff was instructed to continue with his other medications. (Tr. 427-30.)

Plaintiff visited Ms. Peissner on January 26, 2011, and reported having increased stressors. Depression screening yielded results positive for severe depression. Plaintiff was noted to be agitated, anxious, and depressed. Plaintiff was assigned a GAF score of 45. (Tr. 506-08.)

On February 11, 2011, Dr. Puckett prescribed Seroquel for insomnia and referred plaintiff to Dr. Miles regarding his continued spinal pain. (Tr. 422-26.)

On February 16, 2011, plaintiff was admitted to urgent care at Northeast Regional Medical Center with complaints associated with bronchitis and sinusitis. Plaintiff was prescribed Augmentin, Medrol Dose Pak, and Albuterol and was instructed to follow up with Dr. Puckett. (Tr. 549-50.)

On February 23, 2011, plaintiff reported to Ms. Peissner that he was down and very discouraged. Plaintiff reported that he was not drinking and that he wanted to stay sober. Ms. Peissner observed plaintiff to be agitated, hyperactive, constricted, irritable, depressed, and discouraged. Ms. Peissner continued in her diagnoses and GAF score. (Tr. 510-12.)

On March 11, 2011, plaintiff reported to Dr. Puckett that the medication for ADHD helped his behavior, even through periods of greater stress. Plaintiff also reported that the medication for bipolar disorder was working and that he was able to function at a normal level, even during periods of extra stress. Physical and

psychiatric examinations were normal.  Plaintiff was continued on Adderall and Seroquel.  (Tr. 412-15.)

Plaintiff returned to FNP Schrage on March 24, 2011, with complaints of itching and depression.  Plaintiff reported having a depressed mood, diminished interest, fatigue, loss of energy, poor concentration, indecisiveness, change in appetite, and sleep disturbance.  It was noted that plaintiff had symptoms of a major depressive episode.  Depression screening yielded positive results for severe depression.  Plaintiff was prescribed Buspar, Seroquel, and Celebrex.  Plaintiff was instructed to follow up as needed.  (Tr. 390-92.)

On April 11, 2011, plaintiff reported to Dr. Puckett that his ADHD symptoms were improving but that he continued to be restless and become easily frustrated.  Plaintiff also complained of a three-month history of having daily episodes of shortness of breath associated with asthma.  Physical and psychiatric examinations were normal.  Pulmonary function tests yielded normal results. Plaintiff was prescribed Albuterol.  (Tr. 407-11, 489-90.)

Plaintiff returned to Ms. Peissner on April 20, 2011, and reported continued problems with mood swings, concentration, and increased interaction.  Plaintiff reported feeling frustrated because of his inability to work.  Plaintiff reported that his medication made him unable to function.  Depression screening yielded results positive for severe depression.  Mental status examination showed plaintiff to have

hyperactive psychomotor behaviors, but was otherwise unremarkable. Plaintiff was noted to be distracted. Ms. Peissner continued in her diagnoses and GAF score. (Tr. 513-15.)

Depression screening on May 4, 2011, continued to show severe depression. Plaintiff reported to Ms. Peissner that being outside and walking helped his ADHD and mood swings. Plaintiff also reported staying clean and sober. Plaintiff reported continued problems with his medications – both with difficulty sleeping and then having a difficult time waking up when he does fall asleep. Mental status examination was unremarkable. Ms. Peissner continued in her diagnoses and GAF score and contacted plaintiff's physician regarding medication side effects. (Tr. 516-18.)

Plaintiff returned to Dr. Puckett on May 12, 2011, with complaints of continued shortness of breath. Plaintiff reported the Albuterol to help some but that daily activities aggravate the condition. Plaintiff reported that Seroquel helped him sleep but that he feels lightheaded and nauseated in the morning, causing him to go back to bed. Plaintiff also reported swelling and numbness in both hands, associated with shortness of breath, joint pain, and fatigue. Plaintiff reported occasional shooting pain through the hands. Physical and psychiatric examinations were normal. Plaintiff was continued on Adderall and was instructed to

discontinue Seroquel. Saphris was prescribed. (Tr. 398-402.) Nerve conduction studies performed that same date yielded normal results. (Tr. 486-88.)

Plaintiff returned to Ms. Peissner on May 25, 2011, and reported feeling depressed every day but that a recent change in medication somewhat helped with sleep and mood. Plaintiff reported that he tried to minimize contact with other people in order to reduce problems with impulse control. Depression screening showed severe depression. Mental status examination was unremarkable. Plaintiff was continued in his diagnoses and GAF score. (Tr. 520-22.)

On June 8, 2011, plaintiff reported to Ms. Peissner that he remained clean and sober in order to set a positive example for his daughter. Depression screening was positive for moderately severe depression. Mental status examination was unremarkable. No change was made to plaintiff's diagnoses and GAF score. (Tr. 523-25.)

On June 29, 2011, Dr. Puckett completed a Physical MSS in which he reported that plaintiff had degenerative disk disease at the C5, C6, and C7 levels, as well as osteoarthritis in the low back with spurs. Dr. Puckett opined that plaintiff could occasionally and/or frequently lift and carry twenty pounds; stand and/or walk at least two hours in an eight-hour workday; sit less than six hours in an eight-hour workday, alternating between sitting and standing; and was limited in ability to push and/or pull with upper and lower extremities because of early

fatigue.  Dr. Puckett also reported that plaintiff's anxiety limited his ability to stay in one place.  Dr. Puckett opined that plaintiff could occasionally climb, balance, kneel, crouch, crawl, and stoop.  Dr. Puckett opined that plaintiff was limited in his ability to reach in all directions because he cannot look up, and was limited in his ability to handle and finger because he easily fatigues.  Dr. Puckett opined that plaintiff could occasionally engage in such manipulative activities.  Dr. Puckett also opined that plaintiff had unlimited ability to feel.  Dr. Puckett opined that plaintiff had no visual or communicative limitations.  Finally, Dr. Puckett opined that plaintiff experienced limitations because of temperature extremes, vibration, humidity and wetness, and hazards.  Dr. Puckett agreed that plaintiff's disability began July 30, 2009.  (Tr. 552-55.)

In a Mental MSS completed August 10, 2011, Dr. Puckett opined that plaintiff's ability to understand, remember, and carry out instructions was not affected by his impairments.  Dr. Puckett opined that plaintiff had moderate limitations in his abilities to interact appropriately with the public and coworkers and to respond appropriately to usual work situations and to changes in a routine work setting.  Dr. Puckett opined that plaintiff was markedly limited in his ability to interact appropriately with supervisors.  Dr. Puckett reported that plaintiff had anger and impulsivity issues that involved recurrent fights and altercations, and

that plaintiff had been fired from jobs because of the above-noted limitations. Dr. Puckett agreed that plaintiff's disability began July 30, 2009. (Tr. 557-59.)

Plaintiff returned to FNP Schrage on September 27, 2011, with symptoms associated with upper respiratory infection. Depression screening yielded negative results. Plaintiff's current medications were noted to include Seroquel, Celebrex, Buspar, Adderall, and Abilify. Plaintiff was prescribed an antibiotic for his current infection. (Tr. 540-42.)

## V. Records Submitted to the Appeals Council[3]

Plaintiff visited Dr. Puckett on June 14, 2011, and reported that Adderall helped him concentrate and adjust to the stress in his life. Plaintiff reported that he continued to not sleep well and that Saphris did not make him feel as "drugged" as Seroquel. Dr. Puckett noted plaintiff's medications to include Abilify, Saphris, Albuterol, Celebrex, and Buspirone. Physical examination was unremarkable, with normal range of motion, muscle strength, stability in all extremities, and no sensory loss. Plaintiff was diagnosed with ADD and insomnia, and his prescription for Adderall was refilled. (Tr. 643-46.)

Plaintiff returned to Dr. Puckett on July 15, 2011, and reported his ADHD to be stable on his current medication and felt that his condition did not create

---

[3] In making its determination to deny review of the ALJ's decision, the Appeals Council considered additional evidence which was not before the ALJ. The Court must consider this additional evidence in determining whether the ALJ's decision was supported by substantial evidence. *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala*, 23 F.3d

problems at home, at work, or socially.  Plaintiff reported that he was doing well on his medication for bipolar disorder but continued to have poor sleep, anxious/ fearful thoughts, depressed mood, excessive worry, fatigue, and loss of appetite. Physical and psychiatric examinations were unremarkable.  Plaintiff was instructed to continue on his current medications.  (Tr. 635-38.)

Plaintiff visited Ms. Peissner on July 20, 2011, and reported being depressed and having negative thoughts.  Plaintiff reported that going to church made him feel better.  Ms. Peissner noted plaintiff to be constricted, anxious, irritable, and depressed.  Ms. Peissner noted plaintiff to be cooperative and to have fair reasoning and judgment.  Plaintiff was also noted to be distracted and to have poor impulse control and insight.  Plaintiff's thought processes were noted to be logical but thought content revealed paranoia, obsessions, and feelings that everything was going wrong in his life.  Plaintiff denied any suicidal or homicidal ideation. Plaintiff was diagnosed with ADHD, predominantly hyperactive-impulsive; bipolar disorder; and alcohol abuse in sustained remission.  Ms. Peissner assigned a current GAF score of 45.  Plaintiff was instructed to continue in his treatment plan.  (Tr. 601-03.)

Plaintiff returned to Dr. Puckett on August 15, 2011, and reported continued difficulty with sleep.  Plaintiff reported that he sleeps one to two hours at night.

---

1441, 1444 (8th Cir. 1994).

Plaintiff reported that Saphris helps him go to sleep but that he does not stay asleep. Plaintiff also reported that the medication makes him feel lightheaded and dizzy. Plaintiff denied any depression. Physical and psychiatric examinations were unremarkable. Doxepin was prescribed for insomnia. (Tr. 631-34.)

Plaintiff returned to Ms. Peissner on September 7, 2011, and reported feeling down, not sleeping, and having racing thoughts. Plaintiff reported that he felt crazy. Plaintiff continued to report abstention from alcohol. Plaintiff reported continued difficulty with concentration and maintaining impulses. Depression screening was positive for severe depression. Ms. Peissner suggested that plaintiff see a psychiatrist for medication management, to which plaintiff responded that he would when he had the money to do so. Mental status examination showed plaintiff to have hyperactive psychomotor behavior, constricted affect, and a discouraged and hopeless attitude. Plaintiff's mood was noted to be elevated, and his memory was intact. Ms. Peissner noted plaintiff's reasoning, judgment, insight, and impulse control to be fair. Ms. Peissner continued in her diagnoses and GAF score. (Tr. 587-99.)

On September 14, 2011, plaintiff reported to Dr. Puckett that his insomnia was worsening and causing his anxiety to increase. Plaintiff's dosage of Doxepin was increased. (Tr. 627-30.)

On September 28, 2011, plaintiff continued to report to Ms. Peissner that he had racing and obsessive thoughts, was feeling down, and not sleeping. Plaintiff reported that he was trying to exercise by walking and doing sit-ups. Depression screening was positive for severe depression. Mental status examination showed plaintiff to be constricted, irritable, depressed, and discouraged. Plaintiff was distracted and exhibited poor insight and impulse control. Plaintiff's reasoning and judgment were noted to be fair. Plaintiff's diagnoses and GAF score remained unchanged. (Tr. 594-96.)

Plaintiff returned to Ms. Peissner on October 19, 2011, who noted there to be no change in plaintiff's mental status. (Tr. 590-92.)

On October 21, 2011, plaintiff reported to Dr. Puckett that his increased dosage of Doxepin knocked him out but that he has bad dreams and feels fatigued and drowsy upon waking. Minipress was added to plaintiff's medication regimen for bad dreams, and plaintiff was instructed to continue with Celebrex. Plaintiff was also instructed to continue with his medications for ADD and bipolar disorder. (Tr. 623-26.)

On November 9, 2011, Ms. Peissner noted plaintiff to appear more depressed, upset, and anxious. Depression screening showed severe depression. Ms. Peissner noted plaintiff to obsess throughout the session and observed that

plaintiff continued to struggle because of lack of sleep. Plaintiff was continued in his diagnoses and GAF score. (Tr. 586-88.)

On November 11, 2011, plaintiff reported to Dr. Puckett that he continued to suffer from insomnia, getting one and a half hours of sleep each day. Plaintiff also reported continued nightmares. Plaintiff reported experiencing dizziness and lightheadedness with low blood pressure at night. Physical and psychiatric examinations were normal. Plaintiff was referred to Dr. Williams for insomnia and was continued on his medications. (Tr. 619-22.)

In a letter to counsel dated December 7, 2011, Ms. Peissner reported that plaintiff had been clean and sober for over one year and that plaintiff's diagnosis of alcohol dependence was in sustained full remission. (Tr. 585.)

On December 14, 2011, plaintiff reported to Dr. Puckett that Adderall was working for his ADHD but that his associated behaviors of short attention span, distraction, and boredom were creating problems. Plaintiff reported no real change in his sleeping behaviors. Plaintiff was continued on his medications. (Tr. 615-18.)

Plaintiff visited FNP Schrage on January 6, 2012, and complained of symptoms associated with upper respiratory infection. Plaintiff also reported being depressed and having difficulty functioning. FPN Schrage noted plaintiff to have a depressed mood, difficulty concentrating, difficulty falling asleep, diminished

interest, and fatigue and restlessness.  Depression screening showed moderately severe depression.  Plaintiff also complained of arthralgias, back pain, myalgia, and neck stiffness.  Plaintiff's medications were noted to include Abilify, Adderall, Buspar, and Celebrex.  Medication was prescribed for his infection.  (Tr. 604-07.)

On January 13, 2012, plaintiff reported to Dr. Puckett that he keeps to himself and does not like being around a lot of people.  Plaintiff reported his ADHD symptoms to be improving.  Plaintiff was continued on his current medications.  (Tr. 611-14.)

## VI.  The ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social Security Act through December 31, 2013.  The ALJ found that plaintiff had not engaged in substantial gainful activity since July 30, 2009, the alleged onset date of disability.  The ALJ found plaintiff's degenerative disc disease of the cervical spine, osteoarthritis of the lower back with spurs, adult ADHD, learning disorder, bipolar II disorder/rule out Asperger's disorder, and history of alcohol and marijuana dependence to be severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13-16.)  The ALJ found plaintiff to have the RFC to perform light work[4] except that he was

_____

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying

- 40 -

limited to "routine and repetitive tasks consistent with unskilled work, involving only simple work-related decisions with few, if any, workplace changes; no interaction with the public; and only occasional interaction with supervisors and coworkers with no tandem tasks." (Tr. 16.) The ALJ found plaintiff unable to perform any of his past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that plaintiff could perform other work existing in significant numbers in the national economy, and specifically, production assembler, hand packager, and machine packager. The ALJ thus found that plaintiff was not under a disability from July 30, 2009, through the date of the decision. (Tr. 20-22.)

## VII.  Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that he is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42

---

of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then he is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is

capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (*citing Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

For the following reasons, the ALJ committed no legal error, and her decision is supported by substantial evidence on the record as a whole.

A.    Medical Opinion Evidence

Plaintiff contends that the ALJ improperly weighed the opinion evidence rendered by his health providers in this cause, thereby affecting the determination regarding the severity of his mental impairments, the resulting RFC, and the hypothetical question posed to the vocational expert.  For the following reasons, the ALJ did not err in her consideration of the opinion evidence.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources.  *See* 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii).[5]  The Regulations require that more weight be given to the opinions of treating physicians than other sources.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)*; see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004).  This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

---

[5] Citations to 20 C.F.R. §§ 404.1527 and 416.927 are to the 2011 version of the Regulations, which were in effect at the time the ALJ rendered the final decision in this cause.  This Regulation's most recent amendment, effective March 26, 2012, reorganizes the subparagraphs relevant to this discussion but does not otherwise change the substance therein.

since these sources are likely to be the medical professionals most
able to provide a detailed, longitudinal picture of [a claimant's]
medical impairment(s) and may bring a unique perspective to the
medical evidence that cannot be obtained from the objective medical
findings alone or from reports of individual examinations, such as
consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

When a treating physician's opinion is not given controlling weight, the

Commissioner must look to various factors in determining what weight to accord

the opinion.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Such factors include the

length of the treatment relationship and the frequency of examination, the nature

and extent of the treatment relationship, whether the treating physician provides

support for his findings, whether other evidence in the record is consistent with the

treating physician's findings, and the treating physician's area of specialty.  20

C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The Regulations further provide that the

Commissioner "will always give good reasons in [the] notice of determination or

decision for the weight [given to the] treating source's opinion."  20 C.F.R. §§

404.1527(d)(2), 416.927(d)(2).

Against this backdrop, the undersigned reviews plaintiff's claims regarding

the weight accorded to the opinion evidence in this cause.

1.      *Dr. Harden*

In her written decision, the ALJ referred to plaintiff's April 2010

consultative examination with Dr. Harden when determining whether plaintiff's

mental impairments met or equaled a listed impairment (Tr. 15) and also in determining plaintiff's RFC (Tr. 19). In weighing the opinion evidence of record, however, the ALJ failed to specifically discuss Dr. Harden's October 2010 Mental MSS. For the following reasons, such failure does not require remand.

As an initial matter, the undersigned notes that Dr. Harden was not a treating source. As such, his opinion is not entitled to any significant weight. *See Browning v. Sullivan,* 958 F.2d 817, 821 (8th Cir. 1992) (it is well settled that the report of a consulting physician who has seen the claimant only once is of little significance by itself). The record does not show Dr. Harden to have had a treating relationship with plaintiff, and the April 2010 evaluation was completed for the purpose of obtaining medical coverage. Although it would have been preferable for the ALJ to have discussed Dr. Harden's October 2010 MSS in her decision, her failure to do so does not mean that it was not considered. *See Black v. Apfel* 143 F.3d 383, 386 (8th Cir. 1998) (citing *Montgomery v. Chater,* 69 F.3d 273, 275 (8th Cir. 1995) (ALJ's failure to cite specific evidence does not indicate that such evidence was not considered)).

Regardless, the undersigned notes that the ALJ accorded significant weight to the opinion of plaintiff's treating physician, Dr. Puckett, as expressed in his August 2011 Mental MSS. A review of Dr. Puckett's Mental MSS shows it to be consistent with Dr. Harden's Mental MSS in that both physicians opined that

plaintiff experienced moderate limitations in dealing with the public and coworkers, and marked limitations in dealing with supervisors. Both physicians also opined that plaintiff had mild or no limitations in his ability to understand, remember, and carry out simple or complex instructions. As such, by according significant weight to an opinion almost entirely consistent with Dr. Harden's, it cannot be said that the ALJ's failure to specifically and separately discuss Dr. Harden's opinion resulted in a decision that failed to consider the limitations expressed therein. *Cf. McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011) (based upon review of record, ALJ did not overlook or ignore potential limitations).

2.      *Dr. Puckett*

As noted above, the ALJ determined to accord significant weight to Dr. Puckett's opinion expressed in the August 2011 Mental MSS. Plaintiff argues, however, that the ALJ failed to incorporate into the RFC determination Dr. Puckett's opinion that plaintiff was markedly limited in his ability to deal with supervisors. Plaintiff's argument is misplaced.

In her RFC determination, the ALJ limited plaintiff to only occasional interaction with supervisors. To engage in an activity "occasionally" means less than frequent in that the activity or condition exists up to one-third of the time. *See Owens v. Colvin*, 727 F.3d 850, 851-82 (8th Cir. 2013) (as defined by the *Dictionary of Occupational Titles*, used by the Regulations as a resource for

determining duties of work). On the Mental MSS form completed by Dr. Puckett, a "marked" limitation is defined as a "serious limitation" resulting in "a substantial loss in the ability to effectively function." (Tr. 557.)[6] Notably, the Mental MSS form also provides a designation of "extreme," defined as a "major limitation" resulting in "no useful ability to function in this area" (*id.*), but Dr. Puckett did not select this designation to describe plaintiff's limitation. As such, Dr. Puckett's opinion of a marked limitation does not preclude performance of the activity in its entirety. The ALJ's restriction to only occasional contact with a supervisor reflects this marked, but not preclusive, limitation. Although a contrary conclusion may have been reached on this same evidence, it cannot be said that the ALJ's determination was not supported by substantial evidence. *See Moore v. Astrue,* 623 F.3d 599, 603 (8th Cir. 2010); *England v. Astrue*, 490 F.3d 1017, 1022 (8th Cir. 2007). This is especially true here where the ALJ noted plaintiff to have capably worked under supervision for a number of years with his mental impairments, reportedly of the same degree to which he currently suffered. *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005). In addition, the undersigned notes that an ALJ is not required to adopt a medical opinion in its entirety, but instead must make an RFC determination upon review of the record as a whole. *Martise v.*

---

[6] The Regulations define a marked limitation as one that "interferes seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Appendix 1, § 12.00(C).

*Astrue*, 641 F.3d 909, 927 (8th Cir. 2011). Because a reading of the ALJ's decision shows the ALJ to have indeed made such a review, it was not error for the ALJ to not further restrict plaintiff's contact with supervisors.

With respect to Dr. Puckett's Physical MSS, the ALJ determined to accord it partial weight, noting that it was not supported by objective evidence, was based on plaintiff's subjective complaints found by the ALJ not to be credible, was inconsistent with his own treatment notes, and was inconsistent with evidence obtained from orthopaedic specialists. (Tr. 20.) Because these reasons are supported by substantial evidence on the record as a whole, the ALJ did not err in according partial weight to Dr. Puckett's opinion as to plaintiff's physical limitations.

First, the ALJ noted that CT scan results of the cervical spine were normal; MRI testing showed only mild and limited cervical bulge with no significant pressure; EMG testing was essentially unremarkable; and range of motion examinations repeatedly showed no limitations. *See Kelley v. Callahan*, 364 F.3d 984, 986 (8th Cir. 2004) (treating physician's opinion must be supported by medically acceptable clinical or diagnostic data). Indeed, the ALJ noted Dr. Puckett's own treatment notes to show normal musculature and range of motion. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." *Davidson v. Astrue,* 578

F.3d 838, 842 (8th Cir. 2009); *see also Hacker v. Barnhart,* 459 F.3d 934, 937 (8th Cir. 2006); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (where limitations set out in a treating physician's assessment "stand alone" and were "never mentioned in [the physician's] numerous records or treatment" nor supported by "any objective testing or reasoning," ALJ's decision to discount treating physician's statement is not error).  In addition, the ALJ noted that orthopaedic specialists did not impose such physical restrictions (Tr. 20) and indeed recommended continued conservative treatment (Tr. 18).  *Cf. Perkins v. Astrue*, 648 F.3d 892, 898-99 (8th Cir. 2011) (ALJ did not err in discounting treating physician's opined physical limitations where musculoskeletal pain specialists did not suggest that pain was unmanageable).

Finally, the ALJ noted that Dr. Puckett's opined limitations appeared to be based on plaintiff's subjective statements, which were determined by the ALJ not to be credible.[7]  Where a treating physician's opinions are largely based on a claimant's subjective complaints rather than on objective findings, an ALJ does not err in giving such opinions less than controlling weight.  *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012).

---

[7] As discussed *infra* at Section VII.D, the ALJ did not err in her adverse credibility

3.    *FNP Schrage*

In her written decision, the ALJ determined to accord little weight to the opinion rendered in FNP Schrage's Physical MSS.  The ALJ first noted FNP Schrage not to be an acceptable medical source under the Regulations and thus unable to render a *medical* opinion.  20 C.F.R. §§ 404.1513(a), 416.913(a).  The ALJ considered FNP Schrage's opinion, however, as it related to the severity of plaintiff's impairments and the effect thereof on plaintiff's ability to function, *see* 20 C.F.R. §§ 404.1513(d), 416.913(d), and noted the opinion to suffer the same infirmities as that rendered by Dr. Puckett.  Namely, the ALJ noted FNP Schrage's opinion to be inconsistent with the objective medical evidence of record, inconsistent with the conservative treatment rendered, and based on plaintiff's subjective complaints.  (Tr. 20.)  For the reasons set out above regarding the weight accorded to Dr. Puckett's opinion regarding plaintiff's physical limitations, the ALJ likewise did not err in the weight accorded to FNP Schrage's opinion.

4.    *Ms. Peissner*

Plaintiff argues that Ms. Peissner's treatment notes consistently show plaintiff's mental impairments to cause severe limitations, given the repeated GAF scores indicating such.  The ALJ, however, accorded little weight to the GAF scores assigned by Ms. Peissner.  This was not error.

determination.

As noted by the Commissioner, the GAF scale has not been endorsed for "use in the Social Security and SSI disability programs" and "does not have a direct correlation to the severity requirements in [the] mental disorders listings." 65 FR 50746-01, 50764, 2000 WL 1173632 (Soc. Sec. Admin. Aug. 21, 2000); *see also Halverson v. Astrue*, 600 F.3d 922, 930-31 (8th Cir. 2010). As such, an ALJ is not bound by GAF scores assigned by a claimant's provider in determining the effects of the claimant's mental impairment; instead, the ALJ must review the record as a whole. *Halverson*, 600 F.3d at 931. This is what the ALJ did here.

The ALJ noted that Ms. Peissner routinely assigned plaintiff low GAF scores indicating serious symptoms. The ALJ noted such scores to be inconsistent, however, with Ms. Peissner's repeated observations that plaintiff engaged in unremarkable behavior, had appropriate speech and affect, maintained attention, exhibited fair reasoning and impulse control, and had logical thought processes. The undersigned also notes that plaintiff's medical providers for his physical impairments consistently found plaintiff's psychiatric examinations to be unremarkable, observing plaintiff to engage in normal behavior and demonstrate normal mood and affect. Although not all the medical evidence "pointed in that direction," there nevertheless was a sufficient amount that did. *See Moad v. Massanari*, 260 F.3d 887, 891 (8th Cir. 2001). The ALJ also noted third party observations to show that plaintiff was able to care for his personal needs, manage

his own financial affairs, engage in social activities with his daughter, go to stores to shop for groceries and personal items, and spend time with others going out for rides. (Tr. 15.) An ALJ need not rely on a provider's assigned GAF scores if the record demonstrates the scores to be extreme in light of other substantial evidence. *Juszczyk v. Astrue*, 542 F.3d 626, 632-33 (8th Cir. 2008); *see also Hudson ex rel. Jones v. Barnhart,* 345 F.3d 661, 666-67 (8th Cir. 2003) (ALJ does not err in according less weight to opinions giving rise to low GAF scores where evidence shows scores not to reflect claimant's actual abilities). Because substantial evidence supports the ALJ's determination to discount the GAF scores assigned by Ms. Peissner, it must be upheld, even if the record could also support an opposite decision. *Weikert*, 977 F.2d at 1252.

In sum, a review of the ALJ's decision shows the ALJ to have properly evaluated plaintiff's limitations in view of the opinion evidence of record and to have provided good reasons for the weight she accorded the opinion evidence. Where, as here, there are conflicts in the evidence, including medical opinion evidence, it is the duty of the Commissioner to resolve such conflicts. *Renstrom,* 680 F.3d at 1065; *Spradling v. Chater*, 126 F.3d 1072, 1075 (8th Cir. 1997); *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995). For the reasons set out above, substantial evidence on the record as whole supports the ALJ's determination as to the weight she accorded the opinion evidence in this cause.

B.    Asthma as a Medically Determinable Impairment

Plaintiff claims that the ALJ erred in failing to consider his asthma condition inasmuch as it was a medically determinable impairment. Plaintiff contends that even if the condition was found not to be a severe impairment, the ALJ was nevertheless required to consider its effects in determining plaintiff's RFC.

As an initial matter, the undersigned notes that plaintiff did not allege in his applications for benefits that he was disabled because of asthma. Further, as noted by the Commissioner, plaintiff's counsel did not include asthma or any other breathing condition in his proffer of plaintiff's medically determinable severe impairments when asked by the ALJ at the administrative hearing. (*See* Tr. 39-40.) Nevertheless, although plaintiff testified at the hearing that he had asthma, used an inhaler, and was easily winded – as acknowledged by the ALJ in her written decision (Tr. 17) – for the following reasons, the ALJ did not err in failing to consider the condition as a medically determinable impairment.

A review of the record shows plaintiff never to have been diagnosed with asthma. Although plaintiff reported to Dr. Puckett in April 2011 that he had been short of breath for three months because of asthma, this was a self-report and was not based upon any diagnosis. Nor are there any recorded signs or laboratory findings showing an asthma impairment. Indeed, pulmonary function testing performed upon plaintiff's subjective report of his symptoms yielded normal

results.  Subjective statements alone cannot constitute a basis upon which to find the existence of an impairment.  *See* 20 C.F.R. §§ 404.1528(a), 416.928(a).  "[S]ymptoms, such as . . . fatigue, shortness of breath, [or] weakness . . . , will not be found to affect [a claimant's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."  20 C.F.R. §§ 404.1529(b), 416.929(b).  *See also* 20 C.F.R. §§ 404.1508, 416.908 (to be considered as a basis for disability, a physical impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms.").  The claimant bears the burden of providing such medical evidence to the Commissioner.  20 C.F.R. §§ 404.1512, 416.912.

In this matter, although the record shows plaintiff to have been diagnosed with and treated for upper respiratory infections on isolated occasions over a four-year period, there is no medical evidence that plaintiff suffered from an asthma condition other than his self-reported statement to Dr. Puckett in April 2011.  Without medical evidence showing the existence of such an impairment, the condition cannot constitute a basis for disability.  20 C.F.R. §§ 404.1508, 416.908; 20 C.F.R. §§ 404.1528(a), 416.928(a).

Accordingly, because the medical evidence fails to establish asthma as a medically determinable impairment, the ALJ did not err in failing to consider the condition as such.

C.    Listings of Mental Impairments

Plaintiff argues that Dr. Harden's Mental MSS, when coupled with Ms. Peissner's low GAF scores, demonstrates that his mental impairments cause him to suffer marked limitations in activities of daily living; social functioning; and concentration, persistence, or pace, thereby rendering his mental impairments to meet Listing 12.04 (affective disorders) or 12.06 (anxiety related disorders) of the Listings of Impairments.

As an initial matter, Ms. Peissner's GAF scores were properly discounted by the ALJ for the reasons previously discussed *supra* at Section VII.A.4.  With respect to the opinions expressed in Dr. Harden's Mental MSS, the undersigned notes them to largely be consistent with those rendered in Dr. Puckett's Mental MSS, to which the ALJ accorded significant weight.  For purposes of this discussion, therefore, the undersigned assumes without deciding that the limitations expressed in Dr. Harden's Mental MSS were accorded significant weight.  Even so, they do not support a finding of marked limitations in at least two domains of functioning as required by Listings 12.04 and 12.06.

In the domain of Activities of Daily Living, the ALJ found plaintiff to experience mild limitations in that evidence showed plaintiff able to care for his personal needs, manage his own financial affairs, and maintain his household by performing chores and preparing meals. (Tr. 15.) Nothing in Dr. Harden's Mental MSS counters this finding, and substantial evidence on the record as a whole supports the ALJ's determination that plaintiff's ability to function in this domain is less than marked. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.00(C) (limitation is "marked" when it interferes seriously with claimant's "ability to function independently, appropriately, effectively, and on a sustained basis"), 12.00(C)(1) (activities of daily living).

With respect to the domain of Social Functioning, the ALJ found plaintiff to experience moderate limitations in that evidence showed plaintiff to enjoy spending time with his daughter, have friends willing to submit statements on his behalf, go shopping multiple times a week for groceries or personal items, spend time on the telephone, and go for rides with others. (Tr. 15.) While the ALJ noted reports of plaintiff's difficulty with authority figures and confrontational behavior, she also noted the record to show that plaintiff successfully maintained employment that required contact with others over a lengthy period of time and with the mental impairments he reportedly currently suffered. (*Id.*) A review of Dr. Harden's Mental MSS shows it to be consistent with the ALJ's finding.

Indeed, while Dr. Harden found plaintiff to experience marked limitations in his ability to interact appropriately with supervisors – noting specifically plaintiff's difficulty with bosses – he nevertheless found plaintiff to be only moderately limited in his ability to interact with the public and with coworkers. (Tr. 385.) In addition, although Dr. Harden reported that plaintiff was socially isolated in his day-to-day life (*id.*), there nevertheless was substantial evidence on the record as a whole to support the ALJ's determination that plaintiff's social functioning was less than marked. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.00(C) (definition of "marked" limitation), 12.00(C)(2) (social functioning).

Finally, in the domain of Concentration, Persistence, or Pace, the ALJ found plaintiff to experience moderate limitations in that evidence showed plaintiff able to manage his financial affairs, which required paying bills, managing a savings account, maintaining a checkbook, using money orders, and counting change; but that psychological evaluation showed plaintiff's concentration and attention to be in the low average range. (Tr. 15.) A review of Dr. Harden's Mental MSS shows it to be consistent with the ALJ's finding. Indeed, Dr. Harden opined that plaintiff suffered no more than mild limitations in his ability to understand, remember, and carry out simple and complex instructions. (Tr. 384.) Because substantial evidence on the record as a whole, including Dr. Harden's Mental MSS, supports the ALJ's determination that plaintiff experienced less than marked limitations in

the domain of Concentration, Persistence, or Pace, plaintiff's contention that Dr. Harden's Mental MSS supports a contrary finding is without merit. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.00(C) (definition of "marked" limitation), 12.00(C)(3) (concentration, persistence, or pace).

D.    Credibility Determination

Plaintiff claims that the ALJ erred in finding his subjective complaints not to be credible, arguing specifically that the ALJ improperly considered his purported continued alcohol abuse as a basis to discredit his complaints and, further, improperly discredited the consistently low GAF scores as reported by Ms. Peissner. For the following reasons, the ALJ did not err in these considerations.

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Halverson,* 600 F.3d at 931; *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). While an ALJ need not explicitly discuss each *Polaski* factor in her decision, she nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints. *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010).

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider his subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." *Masterson v. Barnhart*, 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in her decision that she considered all of the evidence. *Id.* at 738; *see also Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the *Polaski* factors but then discredits a claimant's complaints for good reason, the decision should be upheld. *Hogan,* 239 F.3d at 962. The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005); *Pearsall*, 274 F.3d at 1218.

Here, the ALJ set out numerous inconsistencies in the record upon which she found plaintiff's subjective complaints not to be entirely credible. First, as discussed *supra* at Section VII.A.2, the ALJ noted that objective medical evidence did not support the severity of plaintiff's complaints as they related to his musculoskeletal impairments. *See Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994) (absence of objective medical evidence supporting allegations of pain is one

- 61 -

factor the ALJ is required to consider). The ALJ also noted that the lack of anything but conservative treatment for such impairments was inconsistent with plaintiff's complaints that the impairments were disabling. *See Moore v. Astrue*, 572 F.3d 520, 525 (8th Cir. 2009) (conservative treatment during period of alleged disability inconsistent with complaints of disabling pain). With respect to plaintiff's mental impairments, the ALJ noted the record evidence to be inconsistent throughout, specifically noting that despite plaintiff's continued reported symptoms of severe depression, providers observed plaintiff on numerous occasions to exhibit unremarkable behavior on mental status and psychiatric examinations. The ALJ further noted that medication helped with many of plaintiff's impairments, observing that plaintiff self-reported to his treating physician in March 2011 that his medication enabled him to function at a normal level. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (impairments that are controllable or amenable to treatment do not support a finding of disability). The ALJ also noted that plaintiff reportedly experienced significant anger and depression issues for many years – including having difficulty with bosses – but that the record showed him to have successfully worked at jobs for lengthy periods of time, including his most recent employment ending in July 2009 after a seven-year period. *See, e.g., Goff,* 421 F.3d at 792-93. Finally, the ALJ noted plaintiff's statements themselves to be inconsistent, noting specifically that plaintiff's

statement that he stayed in bed most of the day was inconsistent with his statement that he needed to keep moving and alternate positions; that plaintiff's statement that he left his last job because of difficulty with others and depression was inconsistent with his statement that his job ended because of his alcohol use; that his statement that doctors recommended surgery for his spine was inconsistent with the record that showed no such recommendation; and that plaintiff's statement that he never intentionally tried to harm himself was inconsistent with his statement to a consulting examiner that he had attempted suicide. *E.g., Boettcher v. Astrue*, 652 F.3d 860, 864 (8th Cir. 2011) (claimant's inconsistent statements about how last job ended was a valid reason to discredit claimant); *Ply v. Massanari*, 251 F.3d 777, 779 (8th Cir. 2001) (inconsistency in claimant's statements valid reason to discredit subjective complaints); *Letson v. Astrue*, 648 F. Supp. 2d 1101, 1120 (E.D. Mo. 2009) (claimant's testimony that condition required aggressive treatment inconsistent with medical record). These reasons to discredit plaintiff's subjective complaints are supported by substantial evidence on the record as a whole.

Plaintiff claims that the ALJ found him to continue to use alcohol despite his testimony that he no longer drank, and that the ALJ used such inconsistency to find plaintiff not credible. Plaintiff contends that because he, in fact, no longer uses alcohol, the ALJ's reliance on this erroneous finding to discredit his complaints

was error.  A review of the decision shows the ALJ to have considered plaintiff's purported continued alcohol use as one of many factors in finding plaintiff's subjective complaints not to be credible.  Because the record as a whole contains substantial evidence to support the ALJ's credibility determination based on the numerous other inconsistencies found by the ALJ, this one component of the credibility determination that may be a factual error is not sufficient to detract from the ALJ's overall, well-supported finding.  *See Baker v. Barnhart*, 457 F.3d 882, 893 (8th Cir. 2006).

Finally, plaintiff claims that Ms. Peissner's consistently low GAF scores were consistent with his subjective complaints of disabling mental impairments and that the ALJ erred in focusing on isolated instances of improvement to find otherwise.  However, as discussed *supra* at Section VII.A.4, the ALJ properly discounted Ms. Peissner's GAF scores when considered upon review of the record as a whole.  Contrary to plaintiff's assertion, the ALJ did not merely view a "snapshot" of the evidence to discredit plaintiff's complaints.  Instead, a review of the decision shows that the ALJ examined the longitudinal record and discredited plaintiff's subjective complaints based on the inconsistencies throughout.

A review of the ALJ's decision shows that, in a manner consistent with and as required by *Polaski*, the ALJ considered plaintiff's subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from

his credibility. Because the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence, this Court must defer to the ALJ's credibility determination. *Goff,* 421 F.3d at 793; *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).

E.    Vocational Expert Testimony

Plaintiff claims that the ALJ erred when she relied on vocational expert testimony to find plaintiff not disabled. Specifically, plaintiff contends that the testimony upon which the ALJ relied was given in response to an incomplete hypothetical question that did not include any exertional limitations despite record evidence that showed plaintiff to be limited in his ability to reach and, further, failed to include mental restrictions consistent with the opinions expressed by his providers that he was markedly limited in dealing with supervisors. Plaintiff does not identify any other concrete consequences missing from the hypothetical. *Robson v. Astrue*, 526 F.3d 389, 393 (8th Cir. 2008).

As discussed *supra* at Section VII.A, the ALJ properly reviewed the medical evidence of record and found it not to support the physical exertional limitations as opined by Dr. Puckett and FNP Schrage. Such evidence includes numerous treatment records that showed normal physical examinations with normal range of motion, normal musculature, no joint abnormality, and normal motor and sensory exams; diagnostic testing that showed only mild conditions; and treatment records

from orthopaedic specialists showing no significant deficits and recommendations for conservative treatment. In light of this objective medical evidence, the ALJ did not err in his determination, and corresponding hypothetical, that plaintiff could perform work without exertional limitations as to reaching. *See Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008).

To the extent plaintiff argues that the ALJ failed to include restrictions in the hypothetical question that were consistent with opinion evidence that plaintiff was markedly limited in his ability to deal with supervisors, such argument fails for the reasons discussed *supra* at Section VII.A.2.

Because the challenged hypothetical question posed to the vocational expert included those impairments and limitations properly found by the ALJ to be substantially supported by the record as a whole, the ALJ did not err in her hypothetical or in her reliance on the testimony given in response to find plaintiff not disabled. *Perkins v. Astrue*, 648 F.3d 892, 901-02 (8th Cir. 2011); *Buckner v. Astrue*, 646 F.3d 549, 560-61 (8th Cir. 2011).

## VIII. Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination that plaintiff was not disabled from July 30, 2009, through the date of the decision is supported by substantial evidence on the record as a whole, and plaintiff's claims of error should be denied. Inasmuch as there is

substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001); *Browning,* 958 F.2d at 821; *see also Buckner,* 646 F.3d at 556.

Therefore,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


<u>        /s/ Terry I. Adelman          </u>
UNITED STATES MAGISTRATE JUDGE


Dated this   <u>5th</u>   day of March, 2014.